NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LONGMONT UNITED HOSPITAL and MAINE COAST MEMORIAL HOSPITAL, on behalf of themselves, and on behalf of a Class of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAINT BARNABAS CORPORATION, d/b/a Saint Barnabas Health Care System, *et al.*,<br><br>Defendant. | : : : : : : : : : : : : : : : | **Hon. Dennis M. Cavanaugh**<br><br>**OPINION**<br><br>Civil Action No. 06 - 2802  (DMC) |

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

This matter comes before the Court upon motion by Defendant Saint Barnabas Corporation ("SBHCS" or "Defendant") to dismiss the Complaint of Longmont United Hospital and Maine Coast Memorial Hospital ("Plaintiffs") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  After carefully considering the submissions and oral arguments of the parties, and for the following reasons, Defendant's motion for dismissal is **granted**.

## BACKGROUND

SBHCS is a not-for-profit New Jersey corporation that is the parent company of the largest tax exempt integrated health care delivery system in New Jersey.  SBHCS provides health care services through several of its subsidiary hospitals.  Plaintiffs filed this action against Defendant alleging that SBHCS hospitals submitted artificially inflated charges, or "turbocharged," and thus received excessive Medicare payments from the federal government. Plaintiffs argue that this practice by Defendant set off a chain reaction that eventually caused the government to award Plaintiffs lower Medicare reimbursements than they would have otherwise

received.

**PLAINTIFFS' COMPLAINT**

Plaintiffs filed a Complaint against Defendant alleging causes of action for civil RICO violations (Counts I - IV), Unfair Competition (Count V) and Negligence (Count VI).  The RICO allegations are asserted in four counts.  Count I alleges that SBHCS violated 18 U.S.C. §§ 2314 and 2315 (The National Stolen Property Act) by transporting and receiving money stolen from the government.  Count II alleges that SBHCS and its subsidiary hospitals conspired to violate RICO in the manner alleged in Count I.  Count III alleges SBHCS defrauded Plaintiffs in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud) by submitting to the government unreasonable and artificially inflated Medicare charges.  Count IV alleges that SBHCS violated RICO in the manner alleged in Count III.  The alleged RICO enterprise, which is the same in all four RICO counts, consists of the SBHCS, its subsidiary hospitals, their officers, directors, employees and agents (the "Enterprise").  The Complaint does not allege that SBHCS stole directly from or defrauded either of the Plaintiffs; instead, it alleges that SBHCS's theft from and/or fraud upon the government caused actions that resulted in the Plaintiff hospitals receiving reduced Medicare payments in subsequent years.  Count V (Unfair Competition) alleges that the submission of inflated charges to Medicare allowed Defendant to receive excessive outlier payments, thus providing SBHCS with an economic advantage over Plaintiffs, hospital's in Maine and Colorado.  Count V further alleges that SBHCS's noncompliance with Medicare regulations provided an unfair competitive advantage over Plaintiffs.  Count VI (Negligence) has been withdrawn by Plaintiffs.

**FACTS**

The crux of Plaintiffs' Complaint is that SBHCS intentionally billed excessive charges to obtain more outlier payments under the diagnosis-related group ("DRG") payment system than

-2-

those to which it was entitled.

Medicare generally pays participating acute care hospitals a fixed amount per discharge based on the beneficiary's discharge diagnosis, which is classified into one of approximately 500 DRGs.  This system is based on an averaging of costs and it assumes that, over time, the expenses incurred for treating costly cases will be balanced by the lower expenses incurred to treat less costly cases.  Congress provided that an acute care hospital "may request additional payments in any case where charges, adjusted to cost, . . . for discharges in fiscal years beginning on or after October 1, 1994, exceed the sum of the applicable DRG prospective payment."  42 U.S.C. § 1395ww(d)(5)(a)(ii).  These additional payments are referred to as outlier payments and are made from what is often referred to as the outlier pool.  The pool is funded by all acute care hospitals collectively.

Plaintiffs claim that Defendant's practice of "turbocharging," or requesting and receiving excessive outlier payments based on artificially inflated costs, damaged them by causing them to receive lower outlier payments.  In other words, the Defendant's alleged scheme to take unauthorized outlier payments from the outlier pool set off a chain of events that resulted in reduced payments received by other hospitals, including Plaintiffs.

SBHCS's outlier payments were the subject of a government investigation.  The government ultimately intervened in two lawsuits against SBHCS and numerous other healthcare providers concerning the outlier payments at issue here.  Defendant entered into a civil settlement agreement with the government wherein SBHCS agreed to pay $265 million to settle the same claims present in this lawsuit.  The settlement agreement was expressly not an admission of liability by SBHCS.

## LEGAL ANALYSIS

### LEGAL STANDARD ON A MOTION TO DISMISS

When considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005).

Under Rule 12(b)(6), a complaint may be dismissed when the plaintiff can prove no set of facts consistent with the allegations that would entitle it to relief. See Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004). While a court must accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, legal conclusions made in the guise of factual allegations will not be given a presumption of truthfulness. See DeJoy v. Comcast Cable Comm., 941 F.Supp. 468, 472 (D.N.J. 1996).

### WHETHER PLAINTIFFS' CLAIMS ARE PROPERLY BEFORE THIS COURT

Defendant argues that Plaintiffs' claims must be dismissed because "Plaintiffs must first pursue the statutory administrative process and, only then if unsuccessful, can they seek recourse in the courts." Defendant's Memorandum on Motion to Dismiss ("Def. Memo") at 8. Defendant contends that Plaintiffs made no appeal to the Center for Medicare and Medicaid Services ("CMS").

Plaintiffs argue that while it is true that a plaintiff asserting claims against a government entity for reimbursement or other relief under the Medicare Act must first exhaust administrative remedies before seeking judicial relief, this is not the case where, as here, a plaintiff asserts its claims against private, non-government entities. See State of Florida v. Tenet Healthcare Corp., 420 F.Supp.2d 1288, 1298 (S.D. Fla. 2005). Plaintiffs assert that their case is about Defendant's conduct and that they are not asserting a claim against a government entity for reimbursement or

other relief.

          Defendant advances the argument that although Plaintiffs are not seeking Medicare

reimbursements from the government, they are seeking to obtain Medicare reimbursements that

have been paid to SBHCS by the government.  Thus, Defendant argues, Plaintiffs claims are

inextricably intertwined with claims for Medicare benefits such that the exhaustion requirements

of 42 U.S.C. § 405 apply.  In support of this proposition, Defendant cites cases in which suits

have been barred against non-governmental parties for failure to exhaust administrative

remedies.

          Plaintiffs assert that there is no provision under the Medicare Act pursuant to which they

could have brought their claims against Defendant in an administrative setting.  See United

States *ex rel* Body v. Blue Cross & Blue Shield of Ala., Inc., 156 F.3d 1098, 1104 (11th Cir.

1998) ("Actions such as Body's which do not seek payment from the government and could not

be brought under section 405 [of the Medicare Act], are therefore not barred [from judicial

review].")

          This is not a suit against the government.  This is not a case in which Plaintiffs seek to

recover Medicare reimbursements from the Secretary of Health and Human Services, nor is this a

case seeking to recover Medicare overpayments by the government.  The Defendant in this case

is not a sovereign and is amenable to suit without exhaustion requirements having been met.

          Defendant, however, argues that if a plaintiff's claims are "inextricably intertwined" then

exhaustion requirements apply even as against a private defendant.  The Supreme Court

explained that when claims are "inextricably intertwined with what [it] hold[s] is in essence a

claim for benefits" then the exhaustion requirement of 24 U.S.C. § 405 applies.  Heckler v.

Ringer, 466 U.S. 602, 625 (1984).  However, Plaintiffs claims are not for Medicare

reimbursements from CMS.  Rather, Plaintiffs seek damages from Defendant in an amount equal

to their lost Medicare reimbursements.  Therefore, this action is not inextricably intertwined with claims for Medicare benefits.

Plaintiffs do not seek payment from the Government, but instead seek recovery from Defendant for damages resulting from the alleged "turbocharging" scheme.  Defendant's argument with respect to exhaustion of administrative remedies is not persuasive.

Defendant's motion to dismiss for Plaintiff's failure to exhaust administrative remedies is denied.

**RICO CLAIMS**

*Standing*

Plaintiffs asserting civil RICO claims must establish that they have standing under 18 U.S.C. § 1964(c).  If not, their claims will be dismissed for failure to state a claim.  Anderson v. Ayling, 396 F.3d 265, 269 (3d Cir. 2005).  The key issue is whether Plaintiffs' "injury was proximately caused by Defendant's violation of 18 U.S.C. § 1962."  Maio v. Aetna, Inc., 221 F.3d 473, 483 (3d Cir. 2000).  By demanding that would-be RICO plaintiffs show "some direct relation between the injury asserted and the injurious conduct alleged," the proximate cause requirement is a key limitation on the expansive use of civil RICO.  Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 266-68 (1992).

The Supreme Court requires the examination of three factors to determine whether an alleged RICO violation is a sufficient proximate cause of a plaintiff's alleged harm: (1) the directness of the injury, (2) the difficulty of apportioning damages among potential victims, and (3) whether there are direct victims of the alleged violation that could better vindicate the policies underlying RICO.  Holmes, 502 U.S. at 268-69.

(1)        Directness of the Alleged Injury

Courts must first look at whether the alleged injury is a direct result of the alleged RICO violation. Anza v. Ideal Steel, 126 S. Ct. 1991, 1996 (2006). ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiffs' injuries."). Directness is the primary focus of the proximate cause analysis. Brokerage Concepts v. U.S. Healthcare, Inc., 140 F.3d 494, 520-21 (3d Cir. 1998).

Defendant argues that the injury here is indirect. Plaintiffs disagree and argue that the excess outlier payments received by Defendant automatically caused the national threshold for Medicare payments to rise, thereby reducing outlier payments to Plaintiffs. The theory is that CMS, having made higher than expected payments to the Defendant, distributed fewer or less in outlier payments from CMS than they would have had Defendant not inflated their charges.

Where a government body is an intervening actor between an alleged RICO violation and the alleged harm, courts in this Circuit and others uniformly dismiss the claims for lack of proximate cause. See Eli Lilly and Co. v. Roussel Corp. 23 F.Supp. 2d 460, 484 (D.N.J. 1998) (dismissing RICO claim where plaintiffs alleged that defendant's misrepresentations to FDA enabled it to fraudulently obtain approval to sell pharmaceutical products, thereby creating unfair competition; FDA approval was an intervening act).

Plaintiffs argue that although CMS raised the threshold which, in turn, reduced the amount of the reimbursement to which they were previously entitled, the Defendant directly caused Plaintiffs' injury because the mere fact that CMS occupied a spatially intermediate position between the alleged act does not destroy the causal nexus. See Tenet Healthcare, 420 F.

-7-

Supp.2d at 1301.  In other words, Plaintiffs argue that CMS had no discretion and that it  was forced to automatically raise the levels necessary to qualify for reimbursements.  Therefore, Plaintiffs urge that there were simply no intervening events between Defendant's alleged wrongful conduct and Plaintiffs' harm.

In support of its argument that the alleged harm depended on the intervening, discretionary acts of CMS and the Office of Management and Budget ("OMB"), Defendant asserts that any harm suffered by Plaintiffs was contingent on how CMS and OMB acted in reaction to the Defendant's alleged overcharging.  Defendant insists that CMS and other agencies within the government are afforded discretion in setting the annual loss thresholds.  Further, Defendant argues that CMS and OMB consider many factors which include nationwide hospital charges from prior years, hospital cost reports, trends in charges and in costs, how much CMS paid for Outlier cases in relation to its targets, changes in other policies affecting the payment system and payment adjustments for low income patients.  Therefore, Defendant believes that CMS operates with much more discretion than Plaintiffs are willing to acknowledge.

Plaintiffs, on the other hand, insist that their alleged injury stems from Defendant's behavior because CMS makes changes in their reimbursement schedule through the automatic use of a mathematical formula.  Plaintiffs cite to the District Court for the Southern District of Florida's holding in Tenet Healthcare for the proposition that the authority delegated to CMS by Congress to set the reimbursement levels between five and six percent of the total DRG payments is irrelevant.  Plaintiffs explain that CMS determined that the intent of Congress is best effectuated with a reimbursement level of 5.1% of the DRG payments.  The Court in the

-8-

Southern District of Florida explained that what CMS might have done is irrelevant since what matters is what CMS in fact did.  <u>Tenet Healthcare</u>, 420 F. Supp.2d at 1301.  Plaintiffs argue that the 5.1% reimbursement rate is and has been set for years.  Essentially, Plaintiffs argue that CMS will make changes in reimbursement levels in order to maintain the same 5.1% reimbursement target.

      In response, Defendant argues that CMS does exercise discretion and that its decision to maintain the 5.1% target is a result of considering many variables and not a decision based on the application of an automatic formula.  To support this contention, Defendant cites to the testimony of Thomas A. Scully ("Scully"), the Administrator for CMS, provided at a hearing of the Subcommittee of the Committee on Appropriations in the United States Senate.  Scully explained the decision of CMS and OMB to leave the loss threshold level untouched, "I have argued strongly within the administration that we should lower the threshold."  <u>See</u> Testimony of Thomas A. Scully before the Subcommittee of The Committee On Appropriations of the United States Senate, March 11, 2003, at pp.12, 45.  It stands to reason that one couldn't "argue strongly" for a change in the threshold if the administration lacked the discretion to change it. Therefore, Scully's testimony indicates that his office does have discretion to change the target rate from anywhere between five and six percent

      The harm allegedly suffered by Plaintiffs does not flow directly and automatically as a result of the actions of Defendant.  Plaintiffs' injuries are derivative of the injuries sustained by CMS and the government is the party directly injured by Defendant's practice of turbocharging.

In <u>Anza v. Ideal Steel Supply Corp.</u>, 126 S. Ct. 1991 (2006), the Supreme Court upheld

dismissal of a civil RICO claim because the alleged RICO predicate acts--failing to charge

customers state sales tax--did not proximately cause the competitor plaintiff's alleged loss in

market share.  The <u>Anza</u> Court emphasized that <u>Holmes v. Sec. Inv. Prot. Corp.</u>, 505 U.S. 258

(1992), requires a "direct relation between the injury asserted and the injurious conduct alleged,"

<u>Anza,</u>  at 1996, and held that the defendant's failure to charge sales tax did not directly injure the

plaintiff.  <u>Id</u>. at 1997.  As this Court explained, <u>Anza</u> relied heavily on the observation that the

plaintiff "was not the direct victim of the predicate acts--the state was."  <u>Zavala v. Wal-Mart</u>

<u>Stores, Inc.</u>, 447 F.Supp.2d 379, 387 (D.N.J. 2006).

In further support of its argument against the existence of proximate cause, Defendant

submitted supplemental case law.  Defendant submitted the <u>Tenet Healthcare</u> decision denying

Plaintiffs class certification.  Defendant calls this Court's attention to the portion of that opinion

which quotes Plaintiff's counsel in the class certification hearing[1] when he described CMS's

approach to setting the threshold (or "FLT") as a trial and error process involving multiple "best-

guess" estimates:

> As Boca's counsel explained at the certification hearing, CMS
> began with an educated guess about what FLT level would meet
> the target total outlier payments of 5.1%.  CMS then used that
> 'best-guess' FLT to estimate total outlier payments by calculating
> the predicted number of claims for the upcoming year based on
> historical data.  If the estimated total payments exceeded 5.1% then
> CMS would adjust the FLT upward to reduce the predicted overall
> payments.  CMS proceeded in this trial and error fashion until it
> found the proper estimated FLT level that would result in predicted
> total outlier payments of 5.1%.

---

[1]  Although the named plaintiffs in this case and the <u>Tenet</u> case are different, all plaintiffs
are represented by the same law firm and theories of liability are identical.

<u>Tenet</u>, 238 F.R.D. at 684.

Plaintiffs could "not identif[y] any formula used by CMS to calculate the FLT, other than the so-called 'iterative process.'" <u>Id.</u> at 699-700.  "Without a precise formula, the task of simulating where CMS would have set the FLT in a world without Tenet's turbocharging (i.e. calculating the 'Tenet-adjusted FLT') involve[s] a certain element of 'best guessing." <u>Id.</u> Without a formula, automatically relied upon by CMS, the injury to Plaintiffs is too remote and damages too speculative.  As the Third Circuit held in <u>V-Tech Servs., Inc. v. Street</u>, 215 Fed.Appx. 93, 96 (3d Cir. 2007), "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  <u>Id.</u> at * 2 (*quoting* <u>Anza</u>, S. Ct. at 1998).  The Third Circuit continued and stated:

> Here, the answer is no.  V-Tech's RICO claims do not satisfy the requirement of proximate causation because the direct victim of the defendants' fraudulent conduct was the federal, state, and local government entities that awarded and thereafter funded the contract, not V-Tech.

<u>Id.</u>

Following the Third Circuit's holding in <u>V-Tech</u>, the District Court for the Eastern District of Pennsylvania dismissed a civil RICO claim for, *inter alia*, lack of proximate cause. Relying on <u>Anza</u>, the court held that "[t]he chain of causation . . . is simply too attenuated to support RICO standing" because "[a]ny number of independent forces and decisions may have intervened between the alleged concealment and the failure of Plaintiffs to bring tort claims against their abusers."  <u>Magnum v. Archdiocese of Philadelphia</u>, 2006 WL 3359642 (E.D. Pa.

Nov. 17, 2006).  Where, as here, the complained of harm flows through an intermediary that has the discretion to act in a certain way or not, there is no proximate cause sufficient to establish a RICO violation.

Plaintiffs point out that the fact that the United States was capable of filing suit to address its injury does not render Plaintiffs' injury too remote for standing purposes under RICO. Plaintiffs cite to <u>Tenet</u> and quote the District Court for the Southern District of Florida, "[i]f the existence of a public authority that could prosecute a claim against putative RICO defendants meant that [a plaintiff's] claim is too remote under <u>Holmes</u>, then no private cause of action could ever be maintained, for every RICO predicate offense, as well as the RICO enterprise itself, is separately prosecutable by the government."  <u>Tenet</u>, 420 F.Supp.2d at 1301.

Defendant is not, however, arguing that any claim under RICO which is separately prosecutable by the government need be dismissed.  Rather, Defendant persuasively argues that when the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims, proximate cause is lacking.  <u>Anza</u> 126 S. Ct. at 1997-98.  This Court recently dismissed a civil RICO claim for lack of proximate cause under the same reasoning.  *See* <u>Glenn v. Hayman</u>, 2007 WL 894213 (D.N.J. March 21, 2007).  In <u>Glenn</u>, a group of prisoners filed suit against a prison warden and other individuals related to the conditions of their confinement.  The prisoners alleged the state was paying for medical services the prisoners were not receiving.  Citing to <u>Anza</u>, this Court found insufficient proximate cause:

> Since the State of New Jersey was the allegedly defrauded party
> (and in no way designated Plaintiffs to litigate the alleged RICO
> claim on behalf of the State), Plaintiffs cannot bring this claim.

Glenn, 2007 WL 894213 at *10.  Therefore, just as Plaintiffs here claim they suffer a separate

injury, it was not sufficient to state a claim because the direct victim was the government.

In this case, CMS has already negotiated a substantial sum from Defendant in repayment

of allegedly excess outlier payments.  Thus, the directly harmed party (which is the federal

government) has recovered.  Therefore, Plaintiffs cannot show the direct harm necessary to

establish proximate cause.

(2).      Difficulty in Apportioning Damages

The second factor in the RICO proximate cause analysis is the difficulty of apportioning

damages.  Holmes, 503 U.S. at 269.  When determining damages is unduly complex and

difficult, a direct causal connection is lacking.  Anza, 126 S. Ct. at 1997.  Defendant contends

that Plaintiffs' claims will involve the Court in an extraordinarily complex and uncertain set of

damage calculations.  Plaintiffs disagree.

Plaintiffs explain that the damages can be calculated mathematically simply by replacing

the cost to charge ratio used to compute Defendant's outlier payments with the Defendant's

actual cost to charge ratio for the years of the payments from the publicly available claims data.

This calculation, Plaintiffs explain, accurately adjusts Defendant's charges to cost.  Plaintiffs

claim that this is a mathematical process using known formulas and databases used by CMS.

Ultimately, Plaintiffs explain, the difference between the payments that the Plaintiff hospitals

actually received and the payments these hospital should have received constitutes Plaintiffs'

damages.

Defendant paints a vastly different picture of calculating damages.  They argue that this

Court would first have to establish what would have been the maximum permissible "reasonable" level of charges.  Plaintiffs, however, dispute this assertion and explain that their method circumvents the need to establish what would have been the "reasonable" level of charges for services by the hospitals for thousands of individual services during the years in question.  Defendant responds, however, and argues that the Court would have to review all of the Defendant Hospitals' individual charges for different services and their relative mark ups over the services' costs to decide which charges CMS should have disallowed and by how much because costs vary widely by department in each hospital and are not uniform.

The potential for speculation, confusion and enormity of task militates against finding that the damages are not too speculative.  Despite Plaintiffs' claim that this calculation would be of no great difficulty, this Court finds that the task would be arduous, complex and would lead to speculation.

(3).     Presence of a Directly Injured Victim

The third proximate cause inquiry is whether Plaintiffs' claim could be vindicated by another, more directly injured party.  Holmes, 503 U.S. at 269-70.  As touched on above, when the government is the directly injured victim, it is especially ready and able to vindicate claims. As the Supreme Court explained in Anza: "If the allegations are true, the State can be expected to pursue appropriate remedies.  The adjudication of the States' claims, moreover, would be relatively straightforward."  126 S. Ct. at 1998.

Defendant argues that the government has a particularly strong resource available to vindicate any fraudulent Medicare claims in the False Claims Act ("FCA"), 31 U.S.C. § 3729(a).

The FCA provides for treble damages plus statutory penalties for unauthorized Medicare claims. In this case, Defendant explains that the FCA's damages and penalty scheme provided the government with ample leverage in settlement negotiations.

The United States settled two *qui tam* suits against SBHCS for $265 million.  The government therefore did "pursue appropriate remedies."  Anza, 126 S. Ct. at 1998.  Defendant urges that it is the responsibility of the government to decide what to do with the funds. Plaintiffs did not offer opposition to this point in their submissions to this Court.

### ***Enterprise***

To state a civil RICO claim against Defendant under 18 U.S.C. § 1962(c), Plaintiffs must allege that Defendant committed unlawful acts through an "enterprise" distinct from itself.  *See* Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001) ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person' and (2) an 'enterprise that is not simply the same person referred to by a different name.").

An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Plaintiffs name Defendant--the Saint Barnabas parent corporation--as the "person" and assert the existence of an "association-in-fact" enterprise consisting of its individual constituent hospitals, their officers, directors, managers, employees and agents.  *See* Compl. §§ 86, 92, 114, 120, 126, 149.  Defendant argues that a corporation cannot be a RICO defendant for conducting an enterprise consisting of its own subsidiaries or employees because the corporation is not distinct from such an enterprise.

In the Third Circuit, RICO plaintiffs cannot evade the distinctiveness requirement by pleading a corporate "enterprise" composed of a defendant's subsidiaries, employees and agents. *See* <u>Gasoline Sales, Inc. v. Aero Oil Co.</u>, 39 F.3d 70, 73 (3d Cir. 1991):

> [A] corporation generally cannot be a defendant under Section 1962(c) for conducting an "enterprise" consisting of its own subsidiaries or employees, or consisting of the corporation itself in association with its subsidiaries or employees.  This is because we have interpreted corporate identity expansively so that the actions of a corporation's agents conducting its normal affairs are constructively its own actions for Section 1962(c) purposes.

<u>Id.</u>

Citing to the Supreme Court's ruling and reasoning in <u>Kushner</u>, Plaintiffs argue that an enterprise for RICO claim purposes does exist in this case.  In that case, the Court held that the existence of a formal legal distinction between the RICO defendant and the RICO enterprise is sufficient unto itself to meet the enterprise requirement.  <u>Kushner</u>, 533 U.S. at 163, 166.  <u>Kushner</u> reversed a Second Circuit decision that held boxing promoter Don King could not be considered a RICO person under § 1962(c) with respect to the alleged enterprise, his wholly owned company.

The Third Circuit has never recognized an enterprise as being distinct when the parent corporation is the RICO person.  Unlike <u>Kushner</u>, Plaintiffs here do not allege RICO liability of a natural person employed by a corporate enterprise.  Instead, they allege RICO liability of one corporation that owns all members of an enterprise consisting of its subsidiaries.  In <u>Kushner</u>, the Supreme Court cited <u>Riverwoods Chappaqua Corp. v. Marine Midland Bank</u>, 30 F.3d 339, 344 (2d Cir. 1994), as an example of a properly dismissed enterprise case.  In <u>Riverwoods</u>, the Second Circuit held that by "alleging a RICO enterprise that consists merely of a corporate

defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctiveness requirement may not be circumvented." *See* Riverwoods, 30 F.3d at 344.

Riverwoods remains good law after Kushner. *See* City of New York v. Cyco Net, Inc., 388 F.Supp.2d 526, 548 (S.D.N.Y. 2005) (dismissing RICO claim alleging an enterprise consisting of same entities as named defendants and noting that "[p]laintiffs' reliance on Kushner is misplaced. The Supreme Court was careful to distinguish the facts in Kushner . . . from other cases . . . [i]n particular . . . Riverwoods."); DTEX LLC v. BBVA Bancomer, 405 F.Supp.2d 639, 651-52 (D.S.C. 2005) (dismissing RICO claim against corporate defendant; "[t]his case is not like Kushner, where there was an identifiable 'person' who was employed by the enterprise. Instead, this case is like Riverwoods: the so-called 'enterprise' cannot logically be separated from the 'person'").

This Court finds that a RICO plaintiff cannot evade the distinctiveness requirement by pleading a corporate enterprise composed solely of a combination of the corporation and its subsidiaries, employees and/or agents.

Without establishing proximate cause or an enterprise, Plaintiffs causes of action under RICO fail as a matter of law. As such, Defendant's motion to dismiss Counts I through IV of Plaintiff's Complaint is granted.

**PLAINTIFFS' UNFAIR COMPETITION CLAIM**

Plaintiffs allege that, in the Provider Agreements, Defendant "expressly represented to CMS" that they would abide by the rules governing Medicare, and then breached that

-17-

representation through their charging practices.  This breach violated the New Jersey common law of unfair competition, Plaintiffs allege, because Defendant thereby obtained an "undeserved economic advantage."

Defendant submits that to succeed with an unfair competition claim under New Jersey common law, a plaintiff must establish that its competitor has used wrongful means to compete with the plaintiff.  C.R. Bard, Inc. v. Wordtronics Corp.,  235 N.J. Super. 168, 174 (Law Div. 1989).  Simply put, unfair competition must entail competition.  Defendant argues that, as a hospital in Maine and a hospital in Colorado, neither Plaintiff is a competitor of SBHCS, due to the obvious geographic separation from its hospitals in New Jersey.

Plaintiffs contend that Defendant directly competes with Plaintiffs to obtain Medicare payments from the same pool.  In support of this argument, Plaintiff cites to case law in New Jersey in which practicing dentists have been held to have an unfair competition claim against other dentists who gained an unfair competitive advantage over them by fraudulent billing practices that enabled them to promise and deliver cost savings to patients that are unavailable to patients of honest practitioners.  See Feiler v. New Jersey Dental Ass'n., 191 N.J. Super. 426 (Ch. Div. 1983), aff'd, 199 N.J. Super. 363 (App. Div.), certification denied, 99 N.J. 196 (1984).

This Court is not persuaded that Feiler stands for the proposition that parties seeking to obtain government funds are always competitors of one another.   There is no authority cited or provided which so states.  In Feiler, the dentists were competing against one another for patients. Here, there is no competition for the same group of patients due to the geographic separation between the hospitals and no competition involving patients is even alleged in Plaintiffs'

-18-

Complaint.   If courts were to view parties that seek finite state funding resources as competitors, then unfair competition claims would rise in virtually every context of government programs and activities.

In further support of its motion to dismiss Plaintiffs' unfair competition claim, Defendant cites Lexington Nat'l Ins. Corp. v. Ranger Ins. Corp., 326 F.3d 416 (3d Cir. 2003).  In granting the defendant's motion to dismiss the plaintiff's unfair competition claim, the Third Circuit held that the plaintiff's contentions were merely that its competitor "acted illegally with respect to the State of New Jersey in a matter plainly collateral to its dealings with its own customers."

The Third Circuit held:

> Indeed, the principles underlying [plaintiff's] claims, if accepted, would justify a business suing its competitor on the theory that it is reducing its costs by violating environmental protection laws or any other federal or state law regulating its operations.  If we hold that [plaintiff] has pled a claim on which relief may be granted we will invite a tidal wave of litigation as businesses find opportunities to meddle in their competitor's affairs.

Lexington, 326 F.3d at 419.

Plaintiffs allege only that Defendant failed to abide by the rules governing Medicare. Under Lexington, it is insufficient for Plaintiffs to state merely that SBHCS "acted illegally with respect to [CMS]."  Id. at 420.

Plaintiffs attempt to distinguish Lexington because, they suggest, that Defendant's excessive Medicare payment claims are directly related to Defendant's business as opposed to the Lexington defendants whose failure to pay taxes was a matter "collateral to the defendant's business dealings."  Id.  Lexington squarely holds that there is no unfair competition claim under

-19-

New Jersey law for acts that involve a fraud on the government rather than one primarily directed against a private plaintiff.

Defendant's motion to dismiss Plaintiff's unfair competition claim is granted..

<u>**CONCLUSION**</u>

For the reasons stated, it is the finding of this Court that Defendant's motion to dismiss is **granted**.  An appropriate Order accompanies this Opinion.

   s/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:  June 22nd,  2007
Orig:  Clerk
cc:   Counsel of Record
      The Honorable Mark Falk, U.S.M.J.
      File